# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 17-0451V**
**Filed: July 8, 2019**
UNPUBLISHED

LARRY WOLFORD,

                Petitioner,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

              Respondent.

Special Processing Unit (SPU); Fact
Hearing; Findings of Fact; Onset;
Post-Hearing Briefing Not Required;
Influenza (Flu) Vaccine; Shoulder
Injury Related to Vaccine
Administration (SIRVA); No Other
Condition or Abnormality

*Isaiah Richard Kalinowski, Maglio Christopher & Toale, PA, Washington, DC, for petitioner.*
*Kyle Edward Pozza, U.S. Department of Justice, Washington, DC, for respondent.*

## FACT RULING[1]

**Dorsey**, Chief Special Master:

On March 29, 2017, Larry Wolford ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*,[2] (the "Vaccine Act").  Petitioner alleges that he suffered a right shoulder injury caused by an influenza ("flu") vaccination he received on November 11, 2015.  Petition at 1-2.  The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, the undersigned finds that the onset of petitioner's right shoulder injury occurred within 48 hours of his November 11, 2015 vaccination.

## I.      Procedural History

The petition in this case was filed on March 29, 2017.  On January 16, 2018, respondent filed a Rule 4(c) report indicating that respondent did not consider this case to be appropriate for compensation (ECF No. 26).  Respondent asserted that petitioner had not established that the onset of his symptoms began within 48 hours of his vaccination.  Respondent further argued that petitioner had pre-existing cervical and upper thoracic issues and that his pain was not limited to his right shoulder.  Specifically concerning onset, respondent argued:

> Petitioner did not seek medical care for his alleged vaccine injury until February 16, 2016, over three months post-vaccination. When he did present to chiropractor Jarrod Thacker, DC, petitioner said that his right arm pain began one week after receiving a flu vaccination in November 2015. Ex. 5 at 3.  As a result, the medical records do not establish that petitioner suffered the first symptoms or manifestation of onset of a shoulder injury within 48 hours of the November 2015 flu vaccination.

Respondent's Rule 4(c) report at 5.

On February 20, 2018, petitioner filed Exhibit 11, Affidavit of Larry Wolford, and Exhibit 12, Affidavit of Patty Wolford (ECF No. 28).  On October 23, 2018, petitioner filed Exhibit 13, Expert Opinion of Jeffrey Boyd, M.D., Regarding Larry Wolford (ECF No. 38).  On November 28, 2018, the parties and an OSM staff attorney held a telephonic status conference to discuss how to proceed.  At the parties' request, the undersigned scheduled a videoconference fact hearing on the issue of onset for May 14, 2019.  Pre-Hearing Order, issued Dec. 7, 2018 (ECF No. 39).

Approximately two weeks before the hearing, on April 29, 2019, respondent filed a status report requesting a pre-hearing status conference.  Respondent's Status Report, filed April 29, 2019 (ECF No. 44).  Respondent noted that he had requested telephone records from petitioner that had not yet been filed.  *Id*.  On the same day, petitioner filed a status report indicating that he had been making efforts to obtain these records.  Petitioner's Status Report, filed April 29, 2019 (ECF No. 45).

On April 30, 2019, a telephonic status conference was held with counsel for both parties and an OSM staff attorney.  Following the status conference, the undersigned issued an order directing petitioner to file a motion for a subpoena and the records.  Scheduling Order, issued April 30, 2019 (ECF No. 47).  The undersigned stated that other than the items listed in the order, evidence not filed by the date set for the record on onset to close would not be admitted absent compelling circumstances.  *Id.*

On May 1, 2019, petitioner filed Pet. Ex. 21, a declaration from the custodian of records for Dinkar Patel, M.D., indicating that no phone records were produced. Pet. Ex. 21 at 2. On June 5, 2019, petitioner filed Pet. Ex. 22, containing phone records with several calls highlighted. Pet. Ex. 22 at 6-7.

On May 14, 2019, the undersigned held a fact hearing on the issue of onset. The petitioner, Larry Wolford, and his wife, Patty Wolford, were witnesses and appeared via videoconference with petitioner's attorney.

On May 23, 2019, the undersigned held a telephonic status conference with the parties. Isaiah Kalinowski appeared on behalf of petitioner, and Kyle Pozza appeared on behalf of respondent. During the status conference, the undersigned indicated that if it was acceptable to the parties, she would issue an oral ruling as to onset during the status conference. Mr. Kalinowski agreed to this approach. Mr. Pozza stated that he thought that there would be briefing before a ruling was issued. The undersigned responded that onset was a factual issue and that the undersigned did not need briefs to resolve onset. The undersigned then proceeded to state her ruling on onset as well as the supporting evidence. The undersigned indicated that the ruling would be memorialized in writing.

Following the May 23, 2019 status conference, the undersigned issued a scheduling order directing petitioner to file additional medical records, an expert report, social security disability records, and employment records. Scheduling Order, issued May 24, 2019 (ECF No. 51).

On June 12, 2019, respondent filed a status report concerning the May 24, 2019 scheduling order. Respondent's Status Report, filed June 12, 2019 (ECF No. 55). In his status report, respondent's counsel noted that during the May 23, 2019 status conference he stated that post-hearing briefing would be appropriate. *Id.* Respondent noted that the May 24, 2019 scheduling order did not reference respondent's request for post-hearing briefing. *Id.*

## II.    Evidence from Medical Records, Affidavits, and Hearing Testimony

While the undersigned has reviewed the entire record, because this ruling concerns only onset, only evidence relevant to onset is summarized herein.

On November 11, 2015, petitioner was seen by his primary care physician, Dr. Dinkar Patel. Pet. Ex. 4 at 34. The record indicates chief complaints of diabetes mellitus and hypercholesterolemia. *Id.* Under "History of Present Illness," the record indicates that petitioner complained of backache, came in for check up on blood sugar, had itching and rash on his right arm, and wanted the flu vaccine. *Id.*

Petitioner testified that he had not previously had the flu vaccine, but that there were advertisements on television that "if you had sugar [diabetes] it would be bad on you if you didn't take it . . . so I went up there . . . just to take a shot." Transcript of May 14, 2019 Hearing ("Tr.") at 15-16, 88. The record documents, "Flu vaccine given. No

reaction noted." Pet. Ex. 4 at 35. Petitioner's detailed immunization record indicates that his flu shot on this date was administered intramuscularly into his right deltoid. Pet. Ex. 10.

At the hearing, petitioner testified that when the vaccine was administered, the nurse "said she felt it tighten up on me, so I don't know where she did or what, but she said she felt it tighten up on me." Tr. at 17. He explained that "when she pulled the needle out, she said it tightened up on her . . . she felt it jerk, the muscle tightened up and everything." *Id.* at 109-10.

Petitioner testified that he began experiencing aching and stiffness the evening of the vaccination. *Id.* at 19. He testified that the shoulder pain disturbed his sleep and awoke him at night beginning the first night following the vaccination. *Id.* at 35. He had to start driving with one hand "[r]ight after the vaccine." *Id.* at 36. He explained that a day or two later he developed a stabbing pain. *Id.* at 26. He then made a "sleeve," or sling, out of a compression sock that, when worn as a sleeve, warmed his arm and reduced his discomfort. *Id.* at 19-20, 26, 31-33.

When asked why he did not go to the emergency room, petitioner testified, "[p]robably because they'd probably tell her to give you a pain shot and stuff, and I didn't want no more shots in the arm." *Id.* at 117; *see also id.* at 123 ("they'd probably want to administrate a shot . . . I didn't want no more shots"). He thought they would probably "say they want you to go to another doctor . . . so don't make no difference." *Id.* He further explained that a couple of days after vaccination, he did not go to the emergency room because "it would get better with treating – with my treating myself, Tylenol, ibuprofen . . . [and] I'd go ahead and everything and put the sleeve on it too, so it would make it, like I say, feel a little better." *Id.* at 118. He added that he also used Icy Hot during this time. *Id.* at 119.

Petitioner testified that his wife usually took care of making medical appointments and filling out medical forms. Tr. at 27, 152-53. He testified that his wife also usually did more of the talking than him. *Id.* at 152. Petitioner testified that at some point he asked his wife to start calling doctors to see if he could be examined, but that he did not recall exactly when that was. *Id.* at 44. He testified that "it's hard to see doctors anymore" and that "he's hard to see and so, but you ought to hang on to what doctor you got right now." *Id.* at 121-22. Petitioner testified that he lives in a remote area and his primary care physician's office is 35 minutes away. *Id.* at 15.

At the hearing, Ms. Wolford testified that "when she [the nurse in Dr. Patel's office] gave him [petitioner] his shot she just kind of – I guess laughed a little bit and said he'd probably get sore because I felt it jerk." *Id.* at 157-58; *see also id.* at 199. Ms. Wolford testified that she was present during the entire visit with Dr. Patel on November 11, 2015 when petitioner received his flu shot and that she also received a flu shot during this visit. *Id.* at 157. She testified that the nurse who administered the vaccine was named Lynette but that she did not know the nurse's last name. *Id.* at 199. The

vaccine administration record indicates that the vaccine was administered by Lynette Gibson.  Pet. Ex. 10.

Ms. Wolford testified, "after we got home, he was complaining with it being sore, just like sore, a dull, aching sore, and – but he thought, you know, it was just normal." Tr. at 158.  She testified that she did not call Dr. Patel's office that day about her husband's pain because the nurse "said it was going to get sore, so he just thought it would be normal."  *Id.* at 201.  She testified that the soreness did not go away but worsened.  *Id.* at 158-59.  She stated that the next day, "he just all of a sudden would be hollering, ouch, and grabbing to his arm."  *Id.* at 159.  However, she testified that he "thought it was just normal from the shot, you know, because she said he'd get sore." *Id.*

Ms. Wolford testified that petitioner used Icy Hot, ibuprofen, and Tylenol for the pain, and made a sleeve to put on to lessen his pain.  *Id.* at 159.  She testified that as time went on in November and December, petitioner would "treat it for a while and then it would go away, and it'd like just come back . . . . I remember him propping it up on, like, a pillow to ease the pain. And I think we took rolled-up quilts, too, to put up under his arm to hold it up where it was sore."  *Id.* at 160.  She recalled seeing him "trying to comb his hair, and he couldn't get his arm up over his head to comb his hair, like he was having trouble moving his arm."  *Id.* at 161.  She could not recall when she observed this but stated that it was before April 2016 and possibly before February 2016.  *Id.* at 161, 173-74.

Ms. Wolford testified that she was not sure when she first called Dr. Patel's office, but believes it was sometime around mid-November or Thanksgiving.  Tr. at 162-63, 202.  She testified that she was told that Dr. Patel "was out of the country at that time" and that he would be gone for a month.  *Id.* at 163, 205.

Petitioner's phone records indicate that calls were made from a number registered to petitioner to the same number in Grundy, VA, (276) 935-6444, 20 times between November 20-24, 2015 and twice on January 15, 2016.  Pet. Ex. 22 at 6-7. The phone records also indicate that two calls were made to (276) 935-8620 in Grundy, VA on January 11, 2016.  Pet. Ex. 22 at 7.  There is no evidence in the record of who these phone numbers belong to.  The main number of the clinic where Dr. Patel practices in Grundy, VA is (276) 935-2148.  *See, e.g.*, Pet. Ex. 9 at 1.

Petitioner's wife testified that petitioner did not see another doctor in the practice because Dr. Patel had "been his doctor for years. He's the only one he sees" and they planned to "wait for him to come back."  Tr. at 163-64.  She testified that she did not initially look for other doctors because petitioner was treating himself and the pain was coming and going.  *Id.* at 164.

In a later record, Dr. Patel included a note stating:

Patient states he came to see me in Nov 2015, I seen him on 11-11-15 but

> he came again to see me and I was out of town and he seen Jerry
> Thacker for right shoulder pain and received physical therapy.

Pet. Ex. 7 at 5 (ECF No. 5-8); *see also* Pet. Ex. 9 at 5 (handwritten version of similar note).[3]

Ms. Wolford testified that eventually she started calling other doctors in the area that she identified by going through a phone book. Tr. at 164. She could not recall the names of the offices she called but stated that there were "a few" and that "they couldn't get him in because . . . they wanted a referral or where it was the holidays and stuff, they wanted it two or three months down the road." *Id.* at 185. Petitioner's wife testified that they did not go to the emergency room because "he was already treating himself anyways. If he went to the emergency room, they just wouldn't probably have done no more than what he's already done." *Id.* at 185. She testified that there are not many medical providers in the area. *Id.* at 203.

She contacted the office of chiropractor Dr. Thacker and was told that he could see petitioner. *Id.* at 165. She could not recall the interval between when she called Dr. Thacker's office and when petitioner was first seen by Dr. Thacker, but said that "it wasn't that long. Probably a couple of days . . . they got him in quick." *Id.*

On February 16, 2016, petitioner presented to chiropractor Jarrod Thacker, DC for an examination. Pet. Ex. 5 at 3. The record states:

> Patient presents with severe upper thoracic/right shoulder/arm/elbow
> thumb pain. Patient explains the pain started after receiving a flu shot in
> November 2015. Patient has pain daily 4/5 times a day made worse with
> certain movements. Pain ranges from 2-8/10 on a pain scale. *Onset*:
> acute, one week after flu shot was administered. *Cause of symptoms*: flu
> shot.

Pet. Ex. 5 at 3.

On examination, Dr. Thacker found that petitioner presented with "severe guarding of the neck and right shoulder." *Id.* Dr. Thacker treated petitioner to relieve pain, decrease inflammation, and to improve function, strength, and range of motion. *Id.* at 4. Petitioner was given shoulder exercises and stretches for impingement syndrome. *Id.*

Petitioner testified that when he saw Dr. Thacker, he told him the reason for his visit was his arm and the flu shot. Tr. at 45. He testified that he did not tell Dr. Thacker when the pain began but that his wife did. *Id.* at 47. Petitioner testified that the notation stating the onset was one week after the flu shot is not accurate. *Id.* at 49, 127-28. On cross-examination, respondent's counsel asked whether petitioner told Dr.

---

[3]  Pet. Ex. 7 may be found at ECF No. 5-8. Because Pet. Ex. 7 is not paginated, the reference to page 5 above refers to the page of the PDF when downloaded from CM/ECF.

Thacker that the onset of his right shoulder pain was acute and was one week after the flu vaccine was administered.  *Id.* at 128.  Petitioner initially responded "yes," but then immediately added, "If that's what – is that what acute means? What does acute mean?"  *Id.*  Respondent's counsel then asked if petitioner told Dr. Thacker that his right shoulder pain began one week after the flu shot was given to him, and petitioner replied "No, no, no. No, no, no, no."  *Id.*  Ms. Wolford testified that "the first time he [petitioner] seen Dr. Thacker, he told Dr. Thacker that it – it got sore that day he took the shot and then it got worse that week."  *Id.* at 206-07.

On February 29, 2016, petitioner saw Dr. Patel with chief complaints of diabetes mellitus and hypercholesterolemia.  Pet. Ex. 4 at 36.  The record further indicates that he had "neck pain, numbness in right arm."  *Id.*  In relation to the neck pain and right arm numbness, the record indicates that he was "[b]eing followed by chiropractor."  *Id.*  He was assessed as having "neck pain with probable degenerative disc disease c spine cervical radicular syndrome right side" as well as osteoarthritis and non-insulin dependent diabetes mellitus II.  *Id.* at 37.  The plan indicated that Dr. Patel "[a]dvised mri of the c spine, Patient states chiropractor is going to do it."  *Id.*

At the hearing, petitioner testified that he told Dr. Patel that the shoulder pain began "[w]hen his nurse had give me the shot, the flu shot."  Tr. at 65.  Ms. Wolford testified that she recalled petitioner "telling him [Dr. Patel] that his – he was having some trouble out of his arm after the shot, after he took that shot . . . he told him that his shoulder had been giving him some trouble since he had the shot."  *Id.* at 169.

On April 11, 2016, petitioner was seen by Dr. Patel.  Pet. Ex. 4 at 38.  The record indicates that he presented for a check of his blood sugar and that he had "right shoulder pain with restricted shoulder movements. Multiple joint pains."  *Id.*  He was assessed as having "right shoulder pain etiology to be determined," osteoarthritis, acute bronchitis, and diabetes mellitus II without complication.  *Id.* at 39.  The record indicates that Dr. Patel. "[a]dvised mri of the right shoulder and Patient is being followed by Dr. Jarrod Thacker."  *Id.*  Dr. Patel recommended that petitioner restrict his activity and continue physical therapy.  *Id.*

On April 18, 2016, petitioner was seen by orthopedist Dr. Jamie Varney, MD.  Pet. Ex. 2 at 3.  The record indicated that the visit was due to right shoulder pain and that he stated that "the symptoms began as the result of started hurting after flu shot."  *Id.*  On examination, petitioner was found to have positive signs on the Hawkins and Neer's impingement tests and the cross body test for shoulder joint pathology. *Id.* at 5.  Dr. Varney's records indicate that he "[d]iscussed that it is unlikely that the flu shot actually caused any damage to his shoulder" and noted that an MRI showed chronic tendinopathy with some tendinitis and bursitis and a downward sloping acromion "that causes rotator cuff impingement".  *Id.* at 7.  Dr. Varney considered that the "[p]revious injection [which appears to refer to the flu shot] may have caused some inflammation of his underlying problems."  *Id.*  Dr. Varney administered a steroid injection into petitioner's right shoulder subacromial space.  *Id.* at 6-7.

Dr. Varney's records include an Orthopedic Information Sheet filled in by hand. Pet. Ex. 2 at 10-13. Petitioner and his wife both testified that the handwriting on the form belongs to petitioner's wife. Tr. at 73, 175. The completed form indicates that the appointment was for an injury from a flu shot that occurred at Dr. Patel's office on November 11, 2015. Pet. Ex. 2 at 11. The "reason for visit" response indicates pain in right shoulder, numbness in thumb. *Id.* In response to a question about when symptoms started, the answer is "same night got sore." *Id.* Petitioner's wife confirmed this statement in her testimony. Tr. at 175.

At the hearing, petitioner was questioned about why he accepted a steroid injection from Dr. Varney but avoided going to the emergency room because he did not want another shot. Petitioner testified that the steroid injection "was supposed to help my pain go and everything, but he did make my sugar go up." Tr. at 135. He further explained that the shot from Dr. Varney was "in the side of the shoulder . . . . It wasn't straight right here up front . . . . I told him I didn't want to take it there." *Id.* at 136. Petitioner testified that he would not have agreed to the injection if Dr. Varney had tried to put it in the front of his deltoid. *Id.* at 137.

Petitioner submitted an expert report from Jeffrey Boyd, M.D., a practicing diagnostic radiologist specializing in musculoskeletal radiology. Pet. Ex. 13 at 1. Dr. Boyd stated, "it is my opinion to a reasonable degree of probability that Mr. Wolford's MRI findings are consistent with having suffered from a SIRVA, for which the onset of injury occurred four months prior to the scan." *Id.* at 6. Petitioner's MRI was done on March 1, 2016, meaning that four months prior to the MRI would be early November. Pet. Ex. 3 at 2.

### III.   Legal Standard

Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act § 11(c)(1). A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Vaccine Act § 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Vaccine Act § 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are

also generally contemporaneous to the medical events." *Curcuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

### IV.   Finding of Fact

To establish a Table SIRVA claim, a petitioner must establish, inter alia, that petitioner's pain occurred within 48 hours of vaccination.  *See* Vaccine Injury Table; Qualifications and Aids to Interpretation, 42 C.F.R. § 100.3(c)(10).  The parties dispute whether this criterion is met in this case.

In his Rule 4(c) report, respondent argued that petitioner had not established that the onset of his symptoms occurred within 48 hours of vaccination.  Respondent cited the fact that petitioner did not seek medical care for his asserted vaccine injury until over three months after vaccination, on February 16, 2016, and that at this visit he reported that his right arm pain began one week after his November 2015 flu vaccination.  Respondent's Rule 4(c) report, filed Jan. 16, 2018, at 5 (ECF No. 26).

During the May 23, 2019 status conference, the undersigned ruled that the onset of petitioner's symptoms occurred on the evening of November 11, 2015, the night of the day on which petitioner received his flu vaccination.  The undersigned bases her ruling on the following evidence.

First, on the handwritten orthopedic information sheet, completed by Ms. Wolford, it states that the injury date was 11-11-15, lists as the injury "flu shot," and in response to the pre-printed question of when the symptoms started states "same night got sore."  Pet. Ex. 2 at 11.  Second, Dr. Varney's note for petitioner's April 18, 2016 visit indicates "Larry states that the symptoms began as the result of started hurting after flu shot."  Pet. Ex. 2 at 3.  This evidence is supported by the testimony of petitioner and Ms. Wolford that the nurse told him it would probably be sore, that petitioner's pain began the evening of the day he received the vaccine, and that the pain disturbed his sleep during that first night.  Tr. at 17-19, 35, 157-59.

Third, the note of chiropractor Dr. Thacker dated February 16, 2016 states, "Patient explains the pain started after receiving a flu shot in November 2015."  Pet. Ex. 5 at 3.  This record further indicates that the onset was "acute, one week after flu shot was administered."  *Id.*

At the hearing, Ms. Wolford testified that her husband reported to Dr. Thacker that his shoulder "got sore that day he took the shot and then it got worse that week." Tr. at 206-07.  Dr. Thacker's note indicating that onset was acute and within one week is consistent with Ms. Wolford's explanation of the pain.  The undersigned found that Ms. Wolford's explanation for why Dr. Thacker's note noted onset of one week was reasonable.  Although petitioner initially responded "yes" to respondent's counsel's question about whether he reported to Dr. Thacker that the onset was acute, one week after the flu shot, after obtaining clarification and being asked simply whether he reported that the onset was one week after the flu shot, petitioner emphatically responded that this was not correct.

Fourth, petitioner and his wife testified in their affidavits and at the hearing that petitioner's pain began on the evening of the flu vaccine, November 11, 2015.

Specifically, Pet. Ex. 11 at ¶¶ 6-7 and the testimony of petitioner and his wife during the hearing support a finding that the onset of petitioner's symptoms was the evening of November 11, 2015.  Petitioner testified that when the vaccine was administered, the nurse "said she felt it tighten up on me, so I don't know where she did or what, but she said she felt it tighten up on me."  Tr. at 17.  Petitioner testified that he began experiencing aching and stiffness the evening of the vaccination. Tr. at 19.  He testified that the shoulder pain disturbed his sleep and awoke him at night beginning the first night following the vaccination.  Tr. at 35.  Although Mr. Wolford's testimony was difficult to understand, he consistently placed the onset of his symptoms at the evening of the vaccination.

Ms. Wolford's testimony also consistently placed onset of petitioner's symptoms as occurring by the evening of the day the vaccine was administered.  Ms. Wolford recalled that when the nurse gave petitioner his shot, "she just, kind of like said, he'd probably be a little sore because I felt it jerk."  Tr. at 157.  She recalled the first name of the nurse who administered the vaccine, which is supported by the vaccine administration record.  She testified, "after we got home, he was complaining with it being sore, just like sore, a dull, aching sore, and – but he thought, you know, it was just normal."  Tr. at 158.  She testified that she did not call Dr. Patel's office that day about her husband's pain because the nurse "said it was going to get sore, so he just thought it would be normal."  Tr. at 201.

Dr. Boyd's expert report found that petitioner's MRI findings were consistent with him having suffered a SIRVA in early November.  This provides further support for the undersigned's finding that petitioner's onset occurred soon after his November 11, 2015 vaccination.

Respondent places great weight on the fact that petitioner did not seek medical care for approximately three months after vaccination.  The undersigned notes that a delay in seeking care is not uncommon in SIRVA cases and is not dispositive.  *See Cooper v. Sec'y of Health and Human Servs.*, No. 16-1387V, 2018 WL 1835179, at *6 (Fed. Cl. Spec. Mstr. Jan. 18, 2018) ("the undersigned does not find a delay in treatment of several months to be dispositive in and of itself regarding the question of onset in a SIRVA case such as this"); *see also Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed. Cl. Spec. Mstr. Mar. 30, 2018); *Ray v. Sec'y of Health and Human Servs.*, No. 16-1388V, 2018 WL 7051571, at *6 (Fed. Cl. Spec. Mstr. Dec. 17, 2018) (*citing Cooper*).  The Vaccine Act "does not mandate that the time of first onset be determined by the earliest entry" in the medical records.  *Lopez v. Sec'y of Health & Human Servs.*, No. 90-12V, 1990 WL 293414 (Cl. Ct. Spec. Mstr. Dec. 10, 1990).

In this case, petitioner and Ms. Wolford testified that they live in a remote area with few doctors. They testified that the nurse told petitioner that the injection site may be painful as she had noted it "jerk" when she administered the vaccine.  They testified that because it was anticipated that petitioner's shoulder would be sore, petitioner did not pursue medical treatment immediately.  They testified that when petitioner did

attempt to obtain care, his primary care physician was away for an extended period of time.

The phone records filed by petitioner demonstrate that numerous calls were made from their phone number to two numbers in Grundy, VA between the date of vaccination and the date when petitioner first saw Dr. Thacker.  The lack of record evidence establishing who these phone numbers belong to limits the value of this piece of evidence.  Nonetheless, these phone records serve to bolster the testimony of petitioner and his wife.

Petitioner and his wife testified that, because these events took place over the holidays, other doctors were unable to fit him in promptly.  During this time, petitioner self-treated to alleviate his pain by using over the counter medications and a homemade sling made from a sock.

Under these circumstances, the undersigned finds that a three-month delay in receiving medical treatment is reasonable and does not cast doubt on whether petitioner's injury occurred within 48 hours of vaccination.

Respondent also emphasizes that Dr. Thacker's record indicates that the onset of petitioner's symptoms occurred one week after the flu vaccination.  While Dr. Thacker's record does state that onset was one week after the flu vaccine, that is not dispositive.  The Vaccine Act contemplates that a record may incorrectly record onset or fail to record onset and provides that:

> The special master or court may find the first symptom or manifestation of onset or significant aggravation of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table *even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period*.

Vaccine Act § 13(b)(2) (emphasis added)

Thus, the exact circumstances present in this case are contemplated by the Vaccine Act.  The fact that a medical record does not record onset or records a time of onset outside of the Table provisions does not automatically eliminate the possibility that a petitioner can establish a Table claim.  Rather, petitioner may still prove a Table claim if he demonstrates, by a preponderance of the evidence, that onset occurred within the time set forth in the Table.  In this case, petitioner has done so.

The undersigned found that Ms. Wolford's explanation, that petitioner reported to Dr. Thacker onset of pain the evening of November 11, 2015 and reported that the symptoms worsened over the week following the flu shot, provides a reasonable explanation for Dr. Thacker's recorded time of onset.  *See, e.g.*, *Stevens v. Sec'y of Health & Human Servs.*, 90-221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. 1990)

(noting that clear, cogent, and consistent testimony can overcome missing or contradictory medical records).

Based on the undersigned's review of the record as a whole, in particular the portions cited herein, the undersigned finds that that the fact that (1) petitioner did not receive medical care until three months after vaccination and (2) the medical record from petitioner's February 16, 2016 appointment with Dr. Thacker lists onset as one week after the flu shot, do not establish that the onset of petitioner's shoulder pain did not occur within 48 hours of vaccination. After a review of all evidence, the undersigned finds that petitioner has established, by a preponderance of the evidence, that the onset of his shoulder pain occurred within 48 hours of his November 11, 2015 flu vaccination.

## V.    Respondent's Request for Post-Hearing Briefing

The undersigned acknowledges that during the May 23, 2019 status conference and in his June 12, 2019 status report, respondent indicated an interest in post-hearing briefing. The undersigned determines that there is sufficient record evidence for a ruling on the record on onset and that, in this case, briefing would not be helpful in evaluating the evidence and determining the factual issue of onset.

Pursuant to Vaccine Rule 8(a), a special master is required "to determine the format for taking evidence and hearing argument based on the specific circumstances of each case and after consultation with the parties." Vaccine Rule 8(a). "In any matter not specifically addressed by the Vaccine Rules, the special master or the court may regulate the applicable practice, consistent with these rules and with the purpose of the Vaccine Act, to decide the case promptly and efficiently." Vaccine Rule 1(b). In conducting proceedings, a special master is responsible for "endeavoring to make the proceedings expeditious, flexible, and less adversarial, while at the same time affording each party a full and fair opportunity to present its case." Vaccine Rule 3(b)(2).

The Vaccine Rules do not provide for routine briefing on factual issues and do not require or contemplate post-hearing briefing. Rather, the rules provide special masters with considerable flexibility in determining the appropriate procedures on a case by case basis. In so doing, the special master is to select procedures that are consistent with the program's goal of making proceedings expeditious and less adversarial while ensuring that all parties are given the opportunity to present their case.

In other cases, special masters have made onset rulings in other cases without post-hearing briefing. *See, e.g.*, *Sherbine (Tinley) v. Sec'y of Health and Human Servs.*, No. 17-0413, 2018 WL 5276612 (Fed. Cl. Spec. Mstr. Sept. 5, 2018); *Brown v. Sec'y of Health and Human Servs.*, No. 13-766, 2015 WL 4626797 (Fed. Cl. Spec. Mstr. July 14, 2015) (issuing ruling on onset following fact hearing without briefing); *see also Caron v. Sec'y of Health and Human Servs.*, No. 15-0777, 2016 WL 7664309 (Fed. Cl. Spec. Mstr. Dec. 14, 2016) (resolving onset without post-hearing briefing, although onset was briefed prior to hearing).

In this case, respondent filed his Rule 4(c) report contesting entitlement based in part on concerns about onset nearly 18 months ago.  Both parties have had ample opportunity to present their case since that time.  In this case in particular, the undersigned finds that the record contains sufficient evidence to make a ruling on onset without the need for briefs.  Thus, the undersigned determines that post-hearing briefs are not necessary or appropriate in this case.

### VI.     Conclusion

In light of all of the above, and in view of the submitted evidence, including the medical records, witness testimony, and affidavits, **the undersigned finds that the onset of petitioner's right shoulder injuries was within 48 hours of vaccination**.

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Chief Special Master