# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: July 11, 2022

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| LARRY WOLFORD, | \* | PUBLISHED |
| | \* | |
| Petitioner, | \* | No. 17-451V |
| | \* | |
| v. | \* | Special Master Nora Beth Dorsey |
| | \* | |
| SECRETARY OF HEALTH | \* | Damages Decision; Influenza ("Flu") |
| AND HUMAN SERVICES, | \* | Vaccine; Shoulder Injury Related to Vaccine |
| | \* | Administration ("SIRVA"). |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Isaiah Richard Kalinowski, Bosson Legal Group, Fairfax, VA, for petitioner.
Kyle Edward Pozza, U.S. Department of Justice, Washington, DC, for respondent.

## DAMAGES DECISION[1]

On March 29, 2017, Larry Wolford ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[2] Petitioner alleges that he suffered a right shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccination administered on November 11, 2015. Petition at 1-3 (ECF No. 1). On July 9, 2021, the undersigned issued a ruling on entitlement, finding that petitioner was entitled to compensation. Ruling on Entitlement dated July 9, 2021 (ECF No. 80).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs. Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that petitioner is entitled to $70,000.00 for actual pain and suffering, and $1,971.85[3] for out-of-pocket medical expenses, for a total award of $71,971.85.

## I.      PROCEDURAL HISTORY

Petitioner filed his petition on March 29, 2017, alleging that he sustained a right shoulder injury caused by a flu vaccine administered on November 11, 2015. Petition at 1-3. The early procedural history from March 2017 through July 2021 was set forth in the undersigned's Fact Ruling and Ruling on Entitlement and will not be repeated here. See Fact Ruling dated July 8, 2019, at 2-3 (ECF No. 56); Ruling on Entitlement at 2.

Thereafter, the parties engaged in settlement discussions but were not able to resolve this matter informally. Petitioner's ("Pet.") Status Report (Rept."), filed Feb. 8, 2022 (ECF No. 98). The parties agreed to submit the issue of pain and suffering to the Court's resolution by briefing. Joint Status Rept., filed Feb. 16, 2022 (ECF No. 100).

On March 4, 2022, petitioner filed a memorandum of law regarding damages. Pet. Opening Memorandum of Law Regarding Damages ("Pet. Mem."), filed Mar. 4, 2022 (ECF No. 103). Respondent filed his response on May 2, 2022. Respondent's Brief on Damages ("Resp. Br."), filed May 2, 2022 (ECF No. 105). Petitioner filed a reply on May 9, 2022. Pet. Reply Memorandum of Law Regarding Damages ("Pet. Reply Mem."), filed May 9, 2022 (ECF No. 106).

This matter is now ripe for adjudication.

## II.      FACTUAL HISTORY[4]

### A.      Pre-Vaccination Medical History

Petitioner's pre-vaccination medical history is significant for non-insulin dependent diabetes mellitus, diabetic neuropathy, weakness, fatigue, numbness in hands and legs, backache, multiple joint pains, gastroesophageal reflux disease, depression, and osteoarthritis. Pet. Ex. 4 at 4-5, 7, 16, 26, 28. No records indicate that petitioner had right shoulder pain prior to vaccination.

---

[3] The parties agreed on the total out-of-pocket expenses in the amount of $1,971.85. Respondent's Brief on Damages ("Resp. Br."), filed May 2, 2022, at 2, 2 n.1 (ECF No. 105).

[4] In the interest of efficiency, this summary is taken from relevant portions of the undersigned's Ruling on Entitlement. See Ruling on Entitlement at 2-8.

**B.      Post-Vaccination Medical History**

The Fact Ruling set forth a summary of petitioner's medical records, affidavits, and hearing testimony relative to onset of his right shoulder injury.  See Fact Ruling at 3-8.  Only the relevant portions will be repeated here.  In the Fact Ruling, the undersigned found the onset of petitioner's right shoulder injury was within 48 hours of vaccination.  Id. at 13.

On November 11, 2015, at fifty-three years old, petitioner was seen by his primary care physician, Dr. Dinkar Patel.  Pet. Ex. 4 at 34.  Current medications included Ultram, Cymbalta, and Neurontin.  Id. at 34-35.  Chief complaints were diabetes mellitus and hypercholesterolemia.  Id. at 34.  Petitioner also complained of backache and itching and rash on his right arm.  Id.  He came for a check up on his blood sugar and wanted a flu vaccine.  Id.  Physical examination by Dr. Patel revealed tenderness in lower back, dermatitis on right arm, and normal range of motion.  Id.  At this visit, Ms. Lynette Gibson administered a flu vaccine in petitioner's right deltoid.  Pet. Ex. 10 at 1.  Dr. Patel documented, "Flu Vaccine given.  No reaction noted."  Pet. Ex. 4 at 35.

At the fact hearing, petitioner testified that when the vaccine was administered, the nurse "said she felt it tighten up on [him]."  Transcript ("Tr.") 17.  He explained that "when she pulled the needle out, she said it tightened up on her . . . she felt it jerk, the muscle tightened up and everything."  Tr. 109-10.  Ms. Wolford testified that "when [the nurse] gave [petitioner] his shot she just kind of—I guess laughed a little bit and said he'd probably get sore because [she] felt it jerk."  Tr. 157-58, 199.  Ms. Wolford testified that she was present during the entire visit with Dr. Patel on November 11, 2015 when petitioner received his flu shot and that she also received a flu shot during this visit.  Tr. 157.

Petitioner testified that he began experiencing aching and stiffness the evening of the vaccination.  Tr. 19.  His shoulder pain disturbed his sleep and woke him up at night beginning the first night following the vaccination.  Tr. 35.  He had to start driving with one hand "[r]ight after the vaccine."  Tr. 36.  He explained that a day or two later he developed a stabbing pain.  Tr. 26.

Ms. Wolford testified that after they got home, petitioner complained of his shoulder being "sore, a dull, aching sore," but they thought it was normal.  Tr. 158.  She testified that she did not call Dr. Patel's office that day about petitioner's pain because the nurse "said it was going to get sore, so he just thought it would be normal."  Tr. 201; see also Tr. 159.  She explained, however, the soreness did not go away but worsened.  Tr. 158-59.  The day after vaccination, "[petitioner] just all of a sudden would be hollering, ouch, and grabbing to his arm."  Tr. 159.

Petitioner explained that he made a "sleeve," or sling, out of a compression sock that, when worn as a sleeve, warmed his arm and reduced his discomfort.  Tr. 19-20, 26, 31-33.  His pain also got better with Tylenol, ibuprofen, and Icy Hot.  Tr. 118-19.  Ms. Wolford also testified to these facts.  Tr. 159.

Ms. Wolford testified that as time went on in November and December 2015, petitioner would "treat it for a while and then it would go away, and it'd like just come back . . . .  [She]

remember[ed] him propping it up on, like, a pillow to ease the pain." Tr. 160.  They also did this with other items like quilts.  Id.  Ms. Wolford recalled seeing petitioner "trying to comb his hair, and he couldn't get his arm up over his head to comb his hair, like he was having trouble moving his arm."  Tr. 161.  She could not recall when she observed this but stated that it was before April 2016 and possibly before February 2016.  Tr. 161, 173-74.

Ms. Wolford testified that she was not sure when she first called Dr. Patel's office, but believed it was sometime around mid-November or Thanksgiving.  Tr. 162-63, 202.  She testified that she was told that Dr. Patel "was out of the country at that time" and that he would be gone for a month.[5]  Tr. 163, 205.  Petitioner's wife testified that petitioner did not see another doctor in the practice because Dr. Patel had "been his doctor for years.  He's the only one he sees" and they planned to "wait for him to come back."  Tr. 163-64.  She testified that she did not initially look for other doctors because petitioner was treating himself and the pain was coming and going.  Tr. 164.

Ms. Wolford testified that eventually she started calling other doctors in the area that she identified by going through a phone book.  Tr. 164.  She could not recall the names of the offices she called but stated that there were "a few" and that "they couldn't get him in because . . . they wanted a referral or where it was the holidays and stuff, they wanted it two or three months down the road."  Tr. 185.  She contacted the office of chiropractor Dr. Jarrod Thacker and was told that he could see petitioner.  Tr. 165.  She could not recall the interval between when she called Dr. Thacker's office and when petitioner was first seen by Dr. Thacker, but said that "it wasn't that long.  Probably a couple of days . . . they got him in quick."  Id.

Petitioner presented to chiropractor, Dr. Thacker, on February 16, 2016 with "severe upper thoracic/right shoulder/arm/elbow thumb pain" that "started after receiving a flu shot in November 2015."  Pet. Ex. 5 at 3.  Petitioner noted onset as "acute, one week after flu shot was administered."[6]  Id.  Petitioner reported "pain daily 4/5 times a day [and] made worse with certain movements.  Pain ranges from 2-8/10 on a pain scale."  Id.  Pain was described as "achy, burning, dull, sharp, stiff, throbbing," and moderate.  Id.  Petitioner further reported numbness in right hand, severe spasms in right cervical paraspinal and right trapezius, right upper extremity weakness, and decreased cervical motion.  Id.  He indicated he was only able to lift 25 pounds and his sleep was affected.  Id.  On physical examination, Dr. Thacker wrote petitioner "presents with severe [guarding] of the neck and right shoulder."  Id.  Petitioner had decreased range of motion.  Id.  Dr. Thacker treated petitioner to relieve pain, decrease inflammation, and to improve function, strength, and range of motion.  Id. at 4.  Petitioner was given shoulder exercises and stretches for impingement syndrome.  Id.

---

[5] In a later record, Dr. Patel included a note stating, "[petitioner] states he came to see me in Nov[ember] 2015, I [saw] him on 11-11-15 but he came again to see me and I was out of town and he [saw] Jerry Thacker for right shoulder pain and received physical therapy."  Pet. Ex. 7 at 5; see also Pet. Ex. 9 at 5 (handwritten version of similar note).

[6] Petitioner testified that the notation stating the onset was one week after the flu shot is not accurate.  Tr. 49, 127-28, 206-07.

Petitioner returned to Dr. Thacker 27 times from February 18, 2016 to November 4, 2016. Pet. Ex. 5 at 6-56; Pet. Ex. 6 at 2-22, 24-32. During the February 24, 2016 visit, Dr. Thacker wrote "[a] [magnetic resonance imaging ("MRI")] consult was discussed with [petitioner] because progression [was] not optimal. [Petitioner] would need to visit [primary care physician ("PCP")] (Dr. D Patel) to obtain order form [for] R shoulder MRI."[7] Pet. Ex. 5 at 13.

On February 29, 2016, petitioner returned to Dr. Patel's office[8] with a chief complaint of diabetes mellitus and hypercholesterolemia. Pet. Ex. 4 at 36. Under review of systems, petitioner complained of neck pain and numbness in right arm and reported seeing a chiropractor. Id. Physical examination revealed tenderness in back of neck with painful neck movements, no stiffness in neck, and normal range of motion. Id. Assessment included "neck pain with probable degenerative disc disease c spine," "cervical radicular syndrome right side," and osteoarthritis. Id. at 37. Petitioner was advised to have an MRI of his cervical spine done.[9] Id.

An MRI of petitioner's right shoulder was conducted on March 1, 2016. Pet. Ex. 3 at 2. Diagnosis was listed as shoulder pain and soreness after flu shot. Id. The impression was "[s]omewhat inferiorly projecting acromion process with mild increased signal intensity changes in the subacromial bursa could represent impingement syndrome[10] or from bursitis.[11] Study otherwise is negative for rotator cuff tear." Id.

---

[7] Dr. Thacker's additional patient notes regarding petitioner's shoulder MRI are as follows:

> 4-7-16: Appointment with patient PCP was set up for 4-13-16 to obtain order for right shoulder MRI. Patient progress is not showing expected results. Patient still suffering from severe pain when certain motions are sought (Mostly overhead/abduction/adduction to R shoulder).
> 4/14/16: Patient had follow up visit with PCP to get a MRI on R shoulder.
> 4/28/16: Patient was referred to orthopedist for consultation of cortisone injection into right shoulder. Injection was administered by Dr. Varney at PMC.

Pet. Ex. 5 at 2.

[8] It is not clear from the record who petitioner saw during this visit.

[9] No records were provided indicating petitioner received a cervical spine MRI. Based on the medical records, it appears petitioner received only a right shoulder MRI.

[10] Impingement syndrome results from "mechanical impingement by the acromion, coracoacromial ligament, coracoid process, or acromioclavicular joint against the rotator cuff." Impingement Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110796 (last visited July 6, 2022).

[11] Bursitis is "inflammation of a bursa." Bursitis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=7315 (last visited July 6, 2022).

Dr. Thacker's examinations in March and April 2016 "show[ed] minimal to no improvement in [petitioner's] subjective or objective complaints/findings." Pet. Ex. 5 at 24, 48. Dr. Thacker discussed a referral to an orthopedist for an injection. Id.

Petitioner returned to Dr. Patel's office[12] on April 11, 2016. Pet. Ex. 4 at 38. Petitioner complained of "right shoulder pain with restricted shoulder movements" as well as multiple joint pain. Id. Physical examination revealed right shoulder tenderness with marked restricted movements and normal range of motion. Id. Assessment included "right shoulder pain etiology to be determined." Id. at 39. Under plan, the record indicates "[a]dvised mri of the right shoulder and [petitioner] is being followed by Dr. [] Thacker." Id. Petitioner was instructed to continue physical therapy. Id.

On April 18, 2016, petitioner saw orthopedist Dr. Jamie Varney at Pikeville Medical Center complaining of right shoulder pain. Pet. Ex. 2 at 3, 7. Petitioner stated "the symptoms have been chronic non-traumatic," occur intermittently, and "began . . . after flu shot." Id. at 3. He described the pain as "piercing" and reported additional pain in his right thumb. Id. at 3, 12. He indicated his "symptoms are aggravated by daily activities and reaching overhead," but are "relieved by physical therapy." Id. At the time of the visit, petitioner reported his symptoms were moderate and his pain was a 2/10. Id. at 3, 11. In a handwritten orthopedic information sheet completed on April 18, 2016,[13] petitioner related his injury back to the flu vaccine received on November 11, 2015 and listed his reason for visit as "pain in right shoulder [and] numbness in thumb." Id. at 11. For when his symptoms started, he wrote "same night got sore." Id. He also described the pain as stabbing and noted it "randomly" goes from 2/10 to 8/10. Id.

Physical examination revealed positive signs on Hawkins and Neer's tests and the cross body test for shoulder joint pathology. Pet. Ex. 2 at 5. Range of motion in petitioner's left shoulder was normal, but there was "pain in impingement arc" noted with regard to petitioner's right shoulder. Id. at 6. Elbow and wrist range of motion in both extremities was normal. Id. Upper extremity strength was normal except for "mild decreased right supraspinatus due to pain." Id. Neurovascular upper extremity examination was normal, although petitioner reported "some decreased sensation on the inner aspect of his thumb." Id. Assessment was impingement syndrome and bursitis of right shoulder. Id. Petitioner received a cortisone injection in the subacromial space in his right shoulder. Id. Dr. Varney stated, "it is unlikely that the flu shot actually caused any damage to his shoulder. MRIs . . . show[] chronic tendinopathy of supraspinatus with some tendinitis and bursitis. Also has a downward sloping acromion that causes rotator cuff impingement. Previous injection may have [] caused some inflammation of his underlying problems."[14] Id. at 7. Petitioner was advised to continue home exercises and physical therapy and ice and take anti-inflammatories as needed. Id.

---

[12] Again, it is not clear from the record who petitioner saw during this visit.

[13] Petitioner and his wife both testified that the handwriting on the form belongs to petitioner's wife. Tr. 73, 175.

[14] Dr. Varney does not define "previous injection." It appears, however, based on the context of the note, that Dr. Varney was referring to the flu vaccination.

On July 21, 2016, petitioner saw Dr. Thacker who noted petitioner "re-injured right shoulder after hanging drywall for 4 hours [on] 7/18/16." Pet. Ex. 6 at 17.

On August 16, 2016, petitioner returned to Dr. Patel for diabetes mellitus and hypercholesterolemia. Pet. Ex. 7 at 2. Petitioner did not complain of shoulder pain at this visit. See id. Physical examination revealed normal range of motion. Id.

Petitioner saw Dr. Patel on October 4, 2016, complaining of "rash on the arm with itching backache, numbness in legs. Came for check up on blood sugar. Cough, chest congestion." Pet. Ex. 7 at 4. On physical examination, range of motion was normal. Id. Dr. Patel noted petitioner was seeing Dr. Thacker for right shoulder pain and physical therapy. Id. at 5.

Petitioner last saw Dr. Thacker on November 4, 2016. Pet. Ex. 6 at 30-32. There is no indication as to why this was petitioner's last visit.

Petitioner complained of diabetes mellitus, hypercholesterolemia, multiple joint pain, numbness in legs, and a cough during a visit to Dr. Patel on December 7, 2016. Pet. Ex. 7 at 6. Petitioner did not complain of right shoulder pain during this visit. See id. Range of motion was normal on physical examination. Id.

Petitioner saw Dr. Patel next on March 9, 2017. Pet. Ex. 9 at 1-2. No complaints of right shoulder pain were noted. See id. Physical examination revealed normal range of motion. Id. at 1. "Right elbow region pain" and "normal range of motion" were noted in petitioner's next visit to Dr. Patel on June 14, 2017. Id. at 3-4.

No additional medical records were provided.

## III.   PARTIES' CONTENTIONS

### A.   Petitioner's Contentions

Petitioner requests a pain and suffering award of $70,000.00. Pet. Mem. at 11; Pet. Reply Mem. at 10. Petitioner contends his "injury follows the more typical pattern in SIRVA cases." Pet. Mem. at 11.

Petitioner acknowledges that he first saw his treating chiropractor, Dr. Thacker, 97 days after vaccination. Pet. Mem. at 10. However, petitioner contends he first contacted his doctor nine days after vaccination, and "[t]he only reason [p]etitioner was not assessed and treated for his pain earlier was due to the unavailability of a doctor to see him." Id. Petitioner argues this gap in onset and his first visit to a medical provider "is not indicative of the absence of pain and suffering and emotional distress." Pet. Reply Mem. at 3.

Petitioner also disputes respondent's argument that petitioner's shoulder and arm pain was not noted in visits later in 2016. Pet. Reply Mem. at 3. "Given that the shoulder injury was gradually improving without further acute incident, it is neither remarkable or relevant that Dr.

Patel did not further reference the injury in later visits." Id. Petitioner contends his continued chiropractic visits are more instructive to the question of pain and suffering. Id. Additionally, at the fact hearing in 2019, petitioner testified he continued to suffer residual effects. Id.

Citing Johnson, petitioner notes that in the lower end of the spectrum of SIRVA cases, pain and suffering awards average between $55,000.00 and $75,000.00. Pet. Mem. at 10 (citing Johnson v. Sec'y of Health & Hum. Servs., No. 18-1486V, 2021 WL 836891, at *5 (Fed. Cl. Spec. Mstr. Jan. 25, 2021)). Petitioners in those cases delayed seeking treatment, and their pain and limitations in range of motion remained mild to moderate. Id. (citing Johnson, 2021 WL 836891 at *5). Petitioner also notes mild cases typically resolve after one to two cortisone injections and two months or less of physical therapy, and pain lasted an average of nine months. Id. (citing Johnson, 2021 WL 836891 at *5).

In Johnson, the petitioner suffered significant pain upon vaccination, but overall suffered a moderate SIRVA injury. Johnson, 2021 WL 836891 at *7. Petitioner took oral steroids, attended six physical therapy sessions, and received one cortisone injection, after which pain levels decreased. Id. "By six months after vaccination, [p]etitioner reported only minor discomfort with certain movements." Id. Additionally, the special master noted petitioner "exhibited normal strength, and the reduction in [range of motion] was never significant," and petitioner "had an unrelated condition which constituted an additional source of pain." Id. at *7-8. Given these facts, the special master awarded petitioner $65,000.00 in pain and suffering. Id. at *8.

Along with Johnson, petitioner cited George v. Secretary of Health & Human Services, No. 18-0426V, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. July 10, 2020) and T.E. v. Secretary of Health & Human Services, No. 19-0633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021) for support. Pet. Mem. at 11.

The petitioner in George did not undergo surgery, received one cortisone injection, attended 40 sessions of physical therapy, and had an "initial course of treatment last[ing] approximately seven months." George, 2020 WL 4692451 at *3. An MRI revealed minimal bursitis and mild tendinopathy of the infraspinatus tendon. Id. at *2. The special master found "[p]etitioner's injury was on the 'mild' end of the spectrum" and awarded petitioner $67,000.00 in pain and suffering. Id. at *2-3.

In T.E., petitioner did not undergo surgery, was treated with one cortisone injection, attended seven sessions of physical therapy, "experienced mild to moderate restrictions in her range of motion and pain with motion," and did not seek further evaluation or treatment after six months post-vaccination. T.E., 2021 WL 2935751 at *4-6. The petitioner received two MRIs and an ultrasound, which her treating physician found did not show "signs of a high-grade partial thickness tear." Id. at *5. The special master found the facts "support[d] a slightly below-median award" and awarded $70,000.00 in pain and suffering. Id. at *4, *6.

Lastly, petitioner notes "[r]espondent failed to provide any comparable cases for the Court's consideration of damages in this case" and failed to provide "any reference to reasoned authority" for respondent's chosen offered amount. Pet. Reply Mem. at 5 (emphasis omitted).

Petitioner asserts "[r]espondent can offer no analogous case to support the amount proposed," while "[p]etitioner's reference to analogous damages rulings places this case within the broader context and backdrop of other cases properly adjudicated by this Court." Id. at 10.

### B.    Respondent's Contentions

Respondent argues that based on the facts of this case, petitioner should be awarded $30,000.00 for pain and suffering. Resp. Br. at 7. Respondent contends the medical records reflect a "relatively mild SIRVA injury." Id. First, because petitioner did not see a medical provider for over three months, "[p]etitioner's shoulder pain was not severe enough to require immediate treatment or hospitalization." Id. Next, respondent asserts petitioner's treatment was limited to chiropractic care and one cortisone injection, with treatment occurring within one year. Id.

Respondent argues George and T.E. are not factually analogous to petitioner's case. Resp. Br. at 8. In George, "petitioner presented to a medical provider three weeks after vaccination, and an MRI revealed minimal bursitis and mild tendinopathy," while petitioner here "waited a little more than three months to seek treatment, and his orthopedist noted . . . [the] MRI . . . show[ed] chronic tendinopathy of supraspinatus with some tendinitis and bursitis." Id. (internal quotations omitted). Respondent, citing Rayborn, notes "a longer delay in seeking initial treatment suggests petitioner's pain was manageable and did not require immediate medical attention." Id. (citing Rayborn v. Sec'y of Health & Hum. Servs., No. 18-0226V, 2020 WL 5522948, at *12 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for actual pain and suffering)). Additionally, the petitioner in George attended forty physical therapy sessions, unlike petitioner here. Id. Regarding T.E., respondent asserts petitioner's reliance is misplaced because T.E. "is a conceded case that does not discuss the age of petitioner or the time interval of her first appointment." Id.

Respondent concludes that "under the totality of the circumstances, an award of $30,000.00 for pain and suffering is just and fair compensation." Resp. Br. at 8. Respondent does not cite to any factually analogous cases for support of such award.

## IV.    LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation.").  Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering.  I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case").  The undersigned may also rely on her experience adjudicating similar claims. [15]  Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Graves, 109 Fed. Cl. at 589-90.  Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

---

[15] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell.  For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to the undersigned as the former Chief Special Master, now Special Master Dorsey.  Since that time, SPU cases have been assigned to Chief Special Master Corcoran.

Although this case was removed from the Special Processing Unit ("SPU") on September 30, 2019, the undersigned finds statistical data from SIRVA cases resolved in SPU to be informative, as they have an extensive history of informal resolution within the SPU.[16]

## V.     PRIOR SIRVA COMPENSATION WITHIN SPU

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU.  As of July 1, 2022, 2,723 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014.  Compensation was awarded in 2,651 of these cases, with the remaining 72 cases dismissed.

Of the compensated cases, 1,513 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation.  In only 114 of these cases was the amount of damages determined by a special master in a reasoned decision.  These written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[17]

1,371 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement—cases via proffer and 28 cases via stipulation.  Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by respondent that the settlement sum itself is a fair measure of damages.  Of course, even though any such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision.  But given the aggregate number of such cases, these determinations nevertheless "provide <u>some</u> evidence of the kinds of awards received overall in comparable cases."  Sakovits v. Sec'y of Health & Hum. Servs., No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (emphasis in original).

The remaining 1,138 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement.  These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded.  Due to the complexity of these settlement discussions, many

---

[16] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims' website by keyword and/or by special master.  On the Court's main page, click on "Opinions/Orders" to access the database.  All figures included in this Decision are derived from a review of the decisions awarding damages within SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximations.

[17] See, e.g., Sakovits v. Sec'y of Health & Hum. Servs., No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[18] Agreement |
|---|---|---|---|---|
| Total Cases | *114* | *1,371* | *28* | *1,138* |
| Lowest | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| 1st Quartile | $72,354.81 | $67,472.00 | $90,000.00 | $40,000.00 |
| Median | **$102,479.12** | **$86,927.85** | **$122,886.42** | **$60,000.00** |
| 3rd Quartile | $125,343.45 | $115,000.00 | $161,001.79 | $115,000.00 |
| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B.   Pain and Suffering Awards in Reasoned Decisions

In the 114 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $100,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[19]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment—over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion, and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy. None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

---

[18] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[19] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. Dhanoa v. Sec'y of Health & Hum. Servs., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 physical therapy sessions over a duration of more than three years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI.  APPROPRIATE COMPENSATION IN THIS SIRVA CASE

### A.  Actual Pain and Suffering

In this case, awareness of the injury is not in dispute. The record reflects that at all times petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

When performing this analysis, the undersigned reviews the record as a whole, including the medical records, affidavits, testimony, and any expert opinions. The undersigned also takes into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, as well as her experience adjudicating these cases. The undersigned bases her decision as to the appropriate amount of damages on the particular facts and circumstances of this specific case.

The medical records establish that petitioner first sought treatment on February 16, 2016, 97 days after his vaccination on November 11, 2015. Respondent argues that this delay in seeking treatment is evidence that "[p]etitioner's shoulder pain was not severe enough to require immediate treatment or hospitalization." Resp. Br. at 7. However, the medical records and testimony at the fact hearing show petitioner had reasonable reasons for his delay in seeking treatment. For example, petitioner tried to see his primary care physician, Dr. Patel, but he was unavailable because he was out of the country. Additionally, petitioner tried to find another doctor, but as petitioner's wife explained, "they couldn't get him in because . . . they wanted a referral or where it was the holidays and stuff, they wanted it two or three months down the road." Tr. 185. Thus, under these circumstances, the undersigned finds that petitioner has a reasonable explanation for his three-month delay in receiving medical treatment, and that this factor alone cannot be used to discount the severity of petitioner's pain during that time.

A review of the records reveals petitioner's pain is described as significant from November 11, 2015, the date of vaccination, to April 2016, after petitioner received a cortisone injection. Beginning on the night of November 11, 2015, the date of vaccination, petitioner experienced aching and stiffness, and the pain woke him up during the night. A day or two later, he developed stabbing pain.

13

On February 16, 2016, petitioner saw chiropractor, Dr. Thacker for "severe upper thoracic/right shoulder/arm/elbow thumb pain" that "started after receiving a flu shot in November 2015." Pet. Ex. 5 at 3. Petitioner reported "pain daily 4/5 times a day [and] made worse with certain movements. Pain ranges from 2-8/10 on a pain scale." Id. Pain was described as "achy, burning, dull, sharp, stiff, throbbing," and moderate. Id. Physical examination revealed "severe [guarding] of the neck and right shoulder" and decreased range of motion. Id.

From February 18, 2016 to November 4, 2016, petitioner visited chiropractor Dr. Thacker 27 additional times for physical therapy. At the February 24, 2016 visit, Dr. Thacker noted "progression not optimal." Pet. Ex. 5 at 13.

An MRI of petitioner's right shoulder was conducted on March 1, 2016, and the impression was "[s]omewhat inferiorly projecting acromion process with mild increased signal intensity changes in the subacromial bursa could represent impingement syndrome or from bursitis. Study otherwise is negative for rotator cuff tear." Pet. Ex. 3 at 2.

Dr. Thacker's examinations in March and April 2016 "show[ed] minimal to no improvement in [petitioner's] subjective or objective complaints/findings." Pet. Ex. 5 at 24, 48. On April 7, 2016, Dr. Thacker wrote, "[p]atient progress not showing expected results. Patient still suffering from severe pain when certain motions are sought . . . ." Id. at 2. Dr. Thacker discussed a referral to an orthopedist for an injection.

On April 11, 2016, at a visit to Dr. Patel, petitioner complained of "right shoulder pain with restricted shoulder movement." Pet. Ex. 4 at 38. Physical examination revealed right shoulder tenderness with marked restricted movements.

On April 18, 2016, petitioner saw orthopedist Dr. Varney, where petitioner reported "the symptoms have been chronic non-traumatic," occur intermittently, and "began . . . after flu shot." Pet. Ex. 2 at 3. He described the pain as "piercing" and "stabbing," indicated his "symptoms are aggravated by daily activities and reaching overhead," and noted the pain "randomly" goes from 2/10 to 8/10. Id. at 3, 11-12. At the time of the visit, petitioner reported his symptoms were moderate and his pain was a 2/10. Dr. Varney administered a cortisone injection. Dr. Varney stated "MRIs . . . show[] chronic tendinopathy of supraspinatus with some tendinitis and bursitis. Also has a downward sloping acromion that causes rotator cuff impingement." Id. at 7.

After the cortisone injection, petitioner continued to see Dr. Thacker until November 2016. Medical records filed after November 2016 do not document complaints of shoulder pain and physical examinations reveal normal range of motion.

In summary, the evidence establishes that petitioner had significant pain for approximately five months, from his vaccination in November 2015 to his cortisone injection in April 2016. Petitioner's period of treatment totals approximately one year, until November 2016. During this year, petitioner visited a chiropractor for physical therapy 28 times, underwent one MRI study, and received one cortisone injection. The undersigned finds petitioner's visits to and treatment by a chiropractor is similar to that of a physical therapist. Petitioner's medical

records show that his physician instructed petitioner to continue physical therapy with Dr. Thacker or referred to petitioner's visits with Dr. Thacker as physical therapy. See Pet. Ex. 2 at 7; Pet. Ex. 4 at 39; Pet. Ex. 7 at 5.

The undersigned has reviewed the cases cited by petitioner to support his position on the appropriate amount for an award of actual pain and suffering. The undersigned finds this case is similar to Johnson and George.

The petitioner in Johnson took oral steroids, attended six physical therapy sessions, and received one cortisone injection, after which her pain levels decreased. Johnson, 2021 WL 836891 at *7. Similarly, petitioner here received one cortisone injection around five months after vaccination; however, petitioner here visited a chiropractor a total of 28 times, which is 22 more visits than the petitioner in Johnson. The Johnson petitioner also "reported only minor discomfort with certain movements" six months post-vaccination, while petitioner in this case continued to see a chiropractor until around one year post-vaccination. Id. Because of the petitioner's additional visits to a chiropractor and extended treatment period, the undersigned finds an award greater than the Johnson petitioner received ($65,000.00) is appropriate.

The petitioner in George, like petitioner here, did not undergo surgery and received one cortisone injection. George, 2020 WL 4692451 at *3. The petitioner in George attended more physical therapy sessions (40 total, 12 more than petitioner here); however, the "initial course of treatment lasted approximately seven months" in George, while petitioner's lasted one year. Id. Additionally, an MRI in George revealed minimal bursitis and mild tendinopathy of the infraspinatus tendon, and petitioner's MRI revealed "chronic tendinopathy of supraspinatus with some tendinitis and bursitis." Id. at *2; Pet. Ex. 2 at 7. Given the longer treatment period and MRI differences, the undersigned finds an award greater than George ($67,000.00) appropriate.

Based on a review of the entire record and consideration of the facts and circumstances presented here, as well as the cases cited by the parties, the undersigned awards $70,000.00 in compensation for petitioner's pain and suffering. Petitioner does not seek compensation for future pain and suffering, and the evidence does not support such damages.

### B.     Award for Past Unreimbursed Expenses

Petitioner's past unreimbursable medical expenses are uncontested. Both parties agree petitioner's past unreimbursable medical expenses equals $1,971.85, and thus, the undersigned finds petitioner is entitled to receive an award of $1,971.85 for past unreimbursable medical expenses.

## VII.    CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

For all the reasons discussed above, the undersigned awards the following compensation:

**A lump sum payment of <u>$71,971.85</u>, representing $70,000.00 for petitioner's actual pain and suffering and $1,971.85 for related out-of-pocket medical expenses, in the form of a check payable to petitioner, Larry Wolford.**

This amount represents compensation for all damages available under § 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[20]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master

---

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.